

David Leit
Member of the Firm
Tel  973 597 2340
Fax 973 597 2341

dleit@lowenstein.com

July 20, 2010

VIA ECF & FEDEX

Honorable Susan G. Wigenton, U.S.D.J
United States District Court
District of New Jersey
Dr. Martin Luther King, Jr. Federal Bldg. & United States Courthouse
50 Walnut Street, P.O. Box 999
Newark, New Jersey 07101

Re:    **Hayward Industries, Inc. v. AquaStar Pool Products, Inc. (Docket No. 10-3571)**

Dear Judge Wigenton:

As you know, we are counsel to Defendant AquaStar Pool Products, Inc. in the above referenced matter.  Currently pending before Your Honor is Hayward's Order to Show Cause seeking a Preliminary Injunction, as well as AquaStar's opposition thereto and Order to Show Cause seeking dissolution of the Temporary Restraining Order entered on July 15, 2010.

We write to bring to the Court's attention a recent case directly on point.  On July 8, 2010, Chief Judge Kozinksi of the United States Court of Appeals for the Ninth Circuit, in a panel opinion joined by Judges Fernandez and Smith, overruled a District Court's decision in a situation remarkably similar to the case pending before Your Honor.  In *Toyota Motor Sales, USA, Inc. v. Farzad Tabari, et. al., CV-03-08506-DSF,* the Ninth Circuit vacated and remanded a District Court's decision which had enjoined the defendant, a broker of Lexus automobiles, from using "any... domain name, service mark, trademark, trade name, meta tag, or other commercial indication of origin that includes the mark LEXUS."  Noting that "a trademark injunction, particularly one involving nominative fair use, can raise serious First Amendment concerns because it can interfere with truthful communication between buyers and sellers in the marketplace," the Court vacated the injunction entered by the District Court, permitting the defendant not only to continue using Lexus trademarks on its web sites and marketing materials, but also to continue using domain names which incorporate the Lexus trademark.

Honorable Susan G. Wigenton                                                July 20, 2010
Page 2

The reasoning of the *Tabari* case is directly applicable here. Accordingly, Hayward's motion for a preliminary injunction must be denied and the TRO entered on July 15, 2010 should be immediately dissolved.

A copy of the Ninth Circuit decision is enclosed for the Court's convenience. The extant TRO is currently disrupting AquaStar's lawful conduct of its business. Accordingly, we renew our request for a hearing from the Court at the earliest possible time.

Respectfully submitted,

David Leit

24561/2
07/20/10 14801508.1

Enclosures
cc:      Scott S. Christie, Esq. (via FedEx and email)
         Bob Lauson, Esq. (via FedEx and email)



**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TOYOTA MOTOR SALES, U.S.A.,
INC., a California corporation,
    *Plaintiff-counter-*
        *defendant-Appellee,*

v.

FARZAD TABARI; LISA TABARI,
California residents, d/b/a FAST
IMPORTS,
    *Defendants-counter-claimants*
        *Appellants.*

No. 07-55344

D.C. No.
CV-03-08506-DSF

OPINION

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted
July 8, 2009—Pasadena, California

Filed July 8, 2010

Before: Alex Kozinski, Chief Judge, Ferdinand F. Fernandez
and N. Randy Smith, Circuit Judges.

Opinion by Chief Judge Kozinski,;
Concurrence by Judge Fernandez

9699

## COUNSEL

Jens B. Koepke (argued), Robin Meadow, Greines, Martin,
Stein & Richland LLP, Los Angeles, California; Alan S. Coo-
per, Howrey, LLP, Washington, DC, for the plaintiff, counter-
defendant, appellee.

Lisa Tabari (argued), Farzad Tabari, pro se, Mission Viejo, California, for the defendants, counter-claimants, appellants.

## OPINION

KOZINSKI, Chief Judge:

In this trademark infringement case, we consider the application of the nominative fair use doctrine to internet domain names.

## Facts

Farzad and Lisa Tabari are auto brokers—the personal shoppers of the automotive world. They contact authorized dealers, solicit bids and arrange for customers to buy from the dealer offering the best combination of location, availability and price. Consumers like this service, as it increases competition among dealers, resulting in greater selection at lower prices. For many of the same reasons, auto manufacturers and dealers aren't so keen on it, as it undermines dealers' territorial exclusivity and lowers profit margins. Until recently, the Tabaris offered this service at buy-a-lexus.com and buyorleaselexus.com.

Toyota Motor Sales U.S.A. ("Toyota") is the exclusive distributor of Lexus vehicles in the United States, and jealous guardian of the Lexus mark. A Toyota marketing executive testified at trial that Toyota spends over $250 million every year promoting the Lexus brand. In the executive's estimation, "Lexus is a very prestigious luxury brand and it is an indication of an exclusive luxury experience." No doubt true.

Toyota objected to the Tabaris' use on their website of copyrighted photography of Lexus vehicles and the circular "L Symbol Design mark." Toyota also took umbrage at the

Tabaris' use of the string "lexus" in their domain names, which it believed was "likely to cause confusion as to the source of [the Tabaris'] web site." The Tabaris removed Toyota's photography and logo from their site and added a disclaimer in large font at the top. But they refused to give up their domain names. Toyota sued, and the district court found infringement after a bench trial. It ordered the Tabaris to cease using their domain names and enjoined them from using the Lexus mark in any other domain name. Pro se as they were at trial, the Tabaris appeal.

## Nominative Fair Use

When customers purchase a Lexus through the Tabaris, they receive a genuine Lexus car sold by an authorized Lexus dealer, and a portion of the proceeds ends up in Toyota's bank account. Toyota doesn't claim the business of brokering Lexus cars is illegal or that it has contracted with its dealers to prohibit selling through a broker. Instead, Toyota is using this trademark lawsuit to make it more difficult for consumers to use the Tabaris to buy a Lexus.

The district court applied the eight-factor test for likelihood of confusion articulated in *AMF Inc.* v. *Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979), and found that the Tabaris' domain names—buy-a-lexus.com and buyorleaselexus.com— infringed the Lexus trademark. But we've held that the *Sleek- craft* analysis doesn't apply where a defendant uses the mark to refer to the trademarked good itself. *See Playboy Enters., Inc.* v. *Welles*, 279 F.3d 796, 801 (9th Cir. 2002); *New Kids on the Block* v. *News Am. Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992).[1] The Tabaris are using the term Lexus to describe

---

[1] This is no less true where, as here, "the defendant's ultimate goal is to describe his own product." *Cairns* v. *Franklin Mint Co.*, 292 F.3d 1139, 1151 (9th Cir. 2002) (emphasis omitted). In *Welles*, for instance, we applied our nominative fair use analysis to a former playmate's use of the Playboy mark to describe herself and her website. 279 F.3d at 801. We observed that, in those circumstances, "application of the *Sleekcraft* test, which focuses on the similarity of the mark used by the plaintiff and the defendant, would lead to the incorrect conclusion that virtually all nomina- tive uses are confusing." *Id.*

their business of brokering Lexus automobiles; when they say Lexus, they mean Lexus. We've long held that such use of the trademark is a fair use, namely nominative fair use. And fair use is, by definition, not infringement. The Tabaris did in fact present a nominative fair use defense to the district court.

[1] In cases where a nominative fair use defense is raised, we ask whether (1) the product was "readily identifiable" without use of the mark; (2) defendant used more of the mark than necessary; or (3) defendant falsely suggested he was sponsored or endorsed by the trademark holder. *Welles*, 279 F.3d at 801 (quoting *New Kids*, 971 F.2d at 308-09). This test "evaluates the likelihood of confusion in nominative use cases." *Id.* It's designed to address the risk that nominative use of the mark will inspire a mistaken belief on the part of consumers that the speaker is sponsored or endorsed by the trademark holder. The third factor speaks directly to the risk of such confusion, and the others do so indirectly: Consumers may reasonably infer sponsorship or endorsement if a company uses an unnecessary trademark or "more" of a mark than necessary. But if the nominative use satisfies the three-factor *New Kids* test, it doesn't infringe. If the nominative use does not satisfy all the *New Kids* factors, the district court may order defendants to modify their use of the mark so that all three factors are satisfied; it may not enjoin nominative use of the mark altogether.[2]

[2] **A.** The district court enjoined the Tabaris from using "any . . . domain name, service mark, trademark, trade name, meta tag or other commercial indication of origin that includes the mark LEXUS." A trademark injunction, particularly one involving nominative fair use, can raise serious First Amendment concerns because it can interfere with truthful communication between buyers and sellers in the market-

---

[2]If defendants are unable or unwilling to modify their use of the mark to comply with *New Kids*, then the district court's order to modify may effectively enjoin defendants from using the mark at all.

place. *See Va. State Bd. of Pharmacy* v. *Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 763-64 (1976). Accordingly, "we must [e]nsure that [the injunction] is tailored to eliminate only the specific harm alleged." *E. & J. Gallo Winery* v. *Gallo Cattle Co.*, 967 F.2d 1280, 1297 (9th Cir. 1992). To uphold the broad injunction entered in this case, we would have to be convinced that consumers are likely to believe a site is sponsored or endorsed by a trademark holder whenever the domain name contains the string of letters that make up the trademark.

In performing this analysis, our focus must be on the " 'reasonably prudent consumer' in the marketplace." *Cf. Dreamwerks Prod. Group, Inc.* v. *SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998) (describing the test for likelihood of confusion in analogous *Sleekcraft* context). The relevant marketplace is the online marketplace, and the relevant consumer is a reasonably prudent consumer accustomed to shopping online; the kind of consumer who is likely to visit the Tabaris' website when shopping for an expensive product like a luxury car. *See, e.g., Interstellar Starship Servs., Ltd.* v. *Epix, Inc.*, 304 F.3d 936, 946 (9th Cir. 2002). Unreasonable, imprudent and inexperienced web-shoppers are not relevant.

[3] The injunction here is plainly overbroad—as even Toyota's counsel grudgingly conceded at oral argument—because it prohibits domain names that on their face dispel any confusion as to sponsorship or endorsement. The Tabaris are prohibited from doing business at sites like independent-lexus-broker.com and we-are-definitely-not-lexus.com, although a reasonable consumer wouldn't believe Toyota sponsors the websites using those domains. Prohibition of such truthful and non-misleading speech does not advance the Lanham Act's purpose of protecting consumers and preventing unfair competition; in fact, it undermines that rationale by frustrating honest communication between the Tabaris and their customers.

Even if we were to modify the injunction to exclude domain names that expressly disclaim sponsorship or endorsement (like the examples above), the injunction would still be too broad. The Tabaris may not do business at lexus-broker.com, even though that's the most straightforward, obvious and truthful way to describe their business. The nominative fair use doctrine allows such truthful use of a mark, even if the speaker fails to expressly disavow association with the trademark holder, so long as it's unlikely to cause confusion as to sponsorship or endorsement. *See Welles*, 279 F.3d at 803 n.26. In *New Kids*, for instance, we found that use of the "New Kids on the Block" mark in a newspaper survey did not infringe, even absent a disclaimer, because the survey said "nothing that expressly or by fair implication connotes endorsement or joint sponsorship." 971 F.2d at 309. Speakers are under no obligation to provide a disclaimer as a condition for engaging in truthful, non-misleading speech.

Although our opinion in *Volkswagenwerk Aktiengesellschaft* v. *Church* remarked on that defendant's "prominent use of the word 'Independent' whenever the terms 'Volkswagen' or 'VW' appeared in his advertising," 411 F.2d 350, 352 (9th Cir. 1969), it isn't to the contrary. The inclusion of such words will usually negate any hint of sponsorship or endorsement, which is why we mentioned them in concluding that there was no infringement in *Volkswagenwerk*. *Id.* But that doesn't mean such words are required, and *Volkswagenwerk* doesn't say they are. Our subsequent cases make clear they're not. *See Welles*, 279 F.3d at 803 n.26; *New Kids*, 971 F.2d at 309.[3]

---

[3]The Sixth Circuit enjoined a domain name in part because it did "not include words like 'independent' or 'unaffiliated,'" but in that case there were additional factors indicating sponsorship or endorsement, including the use of stylized versions of the plaintiff's marks on the site. *PACCAR Inc.* v. *TeleScan Techs., L.L.C.*, 319 F.3d 243, 256-57 (6th Cir. 2003). Where these or other factors suggest that nominative use is likely to cause confusion, a disclaimer may well be necessary. But a disclaimer is not required every time a URL contains a mark.

[4] The district court reasoned that the fact that an internet domain contains a trademark will "generally" suggest sponsorship or endorsement by the trademark holder. When a domain name consists *only* of the trademark followed by .com, or some other suffix like .org or .net, it will typically suggest sponsorship or endorsement by the trademark holder. *Cf. Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1327 (9th Cir. 1998).[4] This is because "[a] customer who is unsure about a company's domain name will often guess that the domain name is also the company's name." *Id.* (quoting *Cardservice Int'l v. McGee*, 950 F. Supp. 737, 741 (E.D. Va. 1997)) (internal quotation marks omitted); *see also Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1045 (9th Cir. 1999). If customers type in trademark.com and find the site occupied by someone other than the trademark holder, they may well believe it *is* the trademark holder, despite contrary evidence on the website itself. Alternatively, they may become discouraged and give up looking for the trademark holder's official site, believing perhaps that such a website doesn't exist. *Panavision*, 141 F.3d at 1327.

---

[4]Of course, not every trademark.com domain name is likely to cause consumer confusion. *See Interstellar Starship*, 304 F.3d at 944-46. For instance, we observed in *Interstellar Starship* that an apple orchard could operate at the website apple.com without risking confusion with Apple Computers, in light of the vast difference between their products. *Id.* at 944. "If, however, the apple grower . . . competed directly with Apple Computer by selling computers, initial interest confusion probably would result," as the apple grower would be using the apple.com domain to appropriate the goodwill Apple Computer had developed in its trademark. *Id.*

When a website deals in goods or services related to a trademarked brand, as in this case, it is much closer to the second example, where apple.com competes with Apple Computers. If a company that repaired iPods, iPads and iPhones were to set up at apple.com, for instance, consumers would naturally assume that the company was sponsored or endorsed by Apple (or, more likely, that it *was* Apple). Where a site is used to sell goods or services related to the trademarked brand, a trademark.com domain will therefore suggest sponsorship or endorsement and will not generally be nominative fair use.

[5] But the case where the URL consists of nothing but a trademark followed by a suffix like .com or .org is a special one indeed. *See Brookfield*, 174 F.3d at 1057.[5] The importance ascribed to trademark.com in fact suggests that far less confusion will result when a domain making nominative use of a trademark includes characters in addition to those making up the mark. *Cf. Entrepreneur Media, Inc.* v. *Smith*, 279 F.3d 1135, 1146-47 (9th Cir. 2002). Because the official Lexus site is almost certain to be found at lexus.com (as, in fact, it is), it's far less likely to be found at other sites containing the word Lexus. On the other hand, a number of sites make nominative use of trademarks in their domains but are not sponsored or endorsed by the trademark holder: You can preen about your Mercedes at mercedesforum.com and mercedes-talk.net, read the latest about your double-skim-no-whip latte at starbucksgossip.com and find out what goodies the world's greatest electronics store has on sale this week at frys-electronics-ads.com. Consumers who use the internet for shopping are generally quite sophisticated about such matters and won't be fooled into thinking that the prestigious German car manufacturer sells boots at mercedesboots.com, or homes at mercedeshomes.com, or that comcastsucks.org is sponsored or endorsed by the TV cable company just because the string of letters making up its trademark appears in the domain.

When people go shopping online, they don't start out by typing random URLs containing trademarked words hoping to

---

[5]Citing our refusal to distinguish between "Golden Door," a spa, and a competing "Golden Door for Hair," the district court treated buyorlea-selexus.com as legally indistinguishable from lexus.com. *Golden Door, Inc.* v. *Odisho*, 646 F.2d 347, 350 (9th Cir. 1980); *see also PACCAR Inc.*, 319 F.3d at 252. According to Toyota, such "legally identical" phrases in a domain name can never be fair use. But there is no such rule; we look to context to determine how much weight to give the words accompanying a mark. *See, e.g., Brother Records, Inc.* v. *Jardine*, 318 F.3d 900, 908 (9th Cir. 2003). In *Golden Door*, we noted that the defendant answered the phone "Golden Door," not "Golden Door for Hair," and featured the words "Golden Door" prominently in its signs. 646 F.2d at 350.

get a lucky hit. They may start out by typing trademark.com, but then they'll rely on a search engine or word of mouth.[6] If word of mouth, confusion is unlikely because the consumer will usually be aware of who runs the site before typing in the URL. And, if the site is located through a search engine, the consumer will click on the link for a likely-relevant site without paying much attention to the URL. Use of a trademark in the site's domain name isn't materially different from use in its text or metatags in this context; a search engine can find a trademark in a site regardless of where exactly it appears. In *Welles*, we upheld a claim that use of a mark in a site's metatags constituted nominative fair use; we reasoned that "[s]earchers would have a much more difficult time locating relevant websites" if the law outlawed such truthful, nonmisleading use of a mark. 279 F.3d at 804. The same logic applies to nominative use of a mark in a domain name.

[6] Of course a domain name containing a mark cannot be nominative fair use if it suggests sponsorship or endorsement by the trademark holder. We've already explained why trademark.com domains have that effect. *See* pp. 9707-08 *supra*. Sites like trademark-USA.com, trademark-of-glendale.com or e-trademark.com will also generally suggest sponsorship or endorsement by the trademark holder; the addition of "e" merely indicates the electronic version of a brand, and a location modifier following a trademark indicates that consumers can expect to find the brand's local subsidiary, franchise or affiliate. *See Visa Int'l Serv. Ass'n* v. *JSL Corp.*, No. 08-15206 (9th Cir. June 28, 2010). For even more obvious reasons, domains like official-trademark-site.com or we-are-trademark.com affirmatively suggest sponsorship or endorsement by the trademark holder and are not nominative fair use.[7]

---

[6] By "word of mouth" we, of course, refer not merely to spoken recommendations from friends and acquaintances, but to the whole range of information available to online shoppers, including chat rooms, discussion forums, feedback and evaluation websites, and the like.

[7] Domain names containing trademarks may also be prohibited because they dilute the value of those marks—for instance, by creating negative

But the district court's injunction is not limited to this narrow class of cases and, indeed, the Tabaris' domain names do not fall within it.

[7] When a domain name making nominative use of a mark does not actively suggest sponsorship or endorsement, the worst that can happen is that some consumers may arrive at the site uncertain as to what they will find. But in the age of FIOS, cable modems, DSL and T1 lines, reasonable, prudent and experienced internet consumers are accustomed to such exploration by trial and error. *Cf. Interstellar Starship*, 304 F.3d at 946. They skip from site to site, ready to hit the back button whenever they're not satisfied with a site's contents. They fully expect to find some sites that aren't what they imagine based on a glance at the domain name or search engine summary. Outside the special case of trademark.com, or domains that actively claim affiliation with the trademark holder, consumers don't form any firm expectations about the sponsorship of a website until they've seen the landing page —if then. This is sensible agnosticism, not consumer confusion. *See* Jennifer E. Rothman, *Initial Interest Confusion: Standing at the Crossroads of Trademark Law*, 27 Cardozo L. Rev. 105, 122-24, 140, 158 (2005). So long as the site as a whole does not suggest sponsorship or endorsement by the trademark holder, such momentary uncertainty does not preclude a finding of nominative fair use.

Toyota argues it is entitled to exclusive use of the string "lexus" in domain names because it spends hundreds of mil-

---

associations with the brand. *Cf. Playboy Enters., Inc.* v. *Netscape Commc'ns Corp.*, 354 F.3d 1020, 1033 (9th Cir. 2004). For example, the website People of Walmart, which publishes rude photos of Walmart shoppers at peopleofwalmart.com, might dilute the Walmart trademark by associating it with violations of customers' privacy and the idea that a visitor to Walmart stores risks being photographed and ridiculed on the internet. *See* Jeffrey Zaslow, *Surviving the Age of Humiliation*, Wall St. J., May 5, 2010, at D1. But Toyota does not allege that the Tabaris' site has any such effect.

lions of dollars every year making sure everyone recognizes and understands the word "Lexus." But "[a] large expenditure of money does not in itself create legally protectable rights." *Smith* v. *Chanel, Inc.*, 402 F.2d 562, 568 (9th Cir. 1968); *see also Ty Inc.* v. *Perryman*, 306 F.3d 509, 513 (7th Cir. 2002); Mark A. Lemley, *The Modern Lanham Act and the Death of Common Sense*, 108 Yale L.J. 1687, 1714-15 (1999). Indeed, it is precisely because of Toyota's investment in the Lexus mark that "[m]uch useful social and commercial discourse would be all but impossible if speakers were under threat of an infringement lawsuit every time they made reference to [Lexus] by using its trademark." *New Kids*, 971 F.2d at 307.[8]

It is the wholesale prohibition of nominative use in domain names that would be unfair. It would be unfair to merchants seeking to communicate the nature of the service or product offered at their sites. And it would be unfair to consumers, who would be deprived of an increasingly important means of receiving such information. As noted, this would have serious First Amendment implications. The only winners would be companies like Toyota, which would acquire greater control over the markets for goods and services related to their trademarked brands, to the detriment of competition and consumers. The nominative fair use doctrine is designed to prevent this type of abuse of the rights granted by the Lanham Act.

**[8] B.** Toyota asserts that, even if the district court's injunction is overbroad, it can be upheld if limited to the Tabaris' actual domain names: buyorleaselexus.com and buy-a-lexus.com. We therefore apply the three-part *New Kids* test to the domain names, and we start by asking whether the

---

[8]"Words . . . do not worm their way into our discourse by accident." Alex Kozinski, *Trademarks Unplugged*, 68 N.Y.U. L. Rev. 960, 975 (1993). Trademark holders engage in "well-orchestrated campaigns intended to burn them into our collective consciousness." *Id.* Although trademark holders gain something by pushing their trademark into the lexicon, they also inevitably lose a measure of control over their mark.

Tabaris' use of the mark was "necessary" to describe their business. Toyota claims it was not, because the Tabaris could have used a domain name that did not contain the Lexus mark. It's true they could have used some other domain name like autobroker.com or fastimports.com, or have used the text of their website to explain their business. But it's enough to satisfy our test for necessity that the Tabaris needed to communicate that they specialize in Lexus vehicles, and using the Lexus mark in their domain names accomplished this goal. While using Lexus in their domain names wasn't the only way to communicate the nature of their business, the same could be said of virtually any choice the Tabaris made about how to convey their message: Rather than using the internet, they could publish advertisements in print; or, instead of taking out print ads, they could rely on word of mouth. We've never adopted such a draconian definition of necessity, and we decline to do so here. In *Volkswagenwerk*, for instance, we affirmed the right of a mechanic to put up a sign advertising that he specialized in repairing Volkswagen cars, although he could have used a sandwich board, distributed leaflets or shouted through a megaphone. 411 F.2d at 352.[9] One way or the other, the Tabaris need to let consumers know that they are brokers of Lexus cars, and that's nearly impossible to do without mentioning Lexus, *cf. Monte Carlo Shirt, Inc.* v. *Daewoo Int'l (Am.) Corp.*, 707 F.2d 1054, 1058 (9th Cir. 1983), be it via domain name, metatag, radio jingle, telephone solicitation or blimp.

---

[9]The Seventh Circuit has similarly upheld the right of a seller of Beanie Babies to operate at "bargainbeanies.com" on the grounds that "[y]ou can't sell a branded product without using its brand name." *Ty Inc.*, 306 F.3d at 512. In a prophetic choice of examples, Judge Posner remarked that prohibiting such a domain name "would amount to saying that if a used car dealer truthfully advertised that it sold Toyotas, or if a muffler manufacturer truthfully advertised that it specialized in making mufflers for installation in Toyotas, Toyota would have a claim of trademark infringement." *Id.*

The fact that the Tabaris also broker other types of cars does not render their use of the Lexus mark unnecessary.[10] Lisa Tabari testified: "I in my conviction and great respect for the company always try to convince the consumer to first purchase a Lexus or Toyota product." If customers decide to buy some other type of car, the Tabaris may help with that, but their specialty is Lexus. The Tabaris are entitled to decide what automotive brands to emphasize in their business, and the district court found that the Tabaris do in fact specialize in Lexus vehicles. Potential customers would naturally be interested in that fact, and it was entirely appropriate for the Tabaris to use the Lexus mark to let them know it.

Nor are we convinced by Toyota's argument that the Tabaris unnecessarily used domain names containing the Lexus trademark as their trade name. *See Volkswagenwerk*, 411 F.2d at 352. The Tabaris' business name is not buyorleaselexus.com or buy-a-lexus.com; it's Fast Imports. Toyota points out that the Tabaris' domain names featured prominently in their advertising, but that by no means proves the domain names were synonymous with the Tabaris' business. The Tabaris may have featured their domain names in their advertisements in order to tell consumers where to find their website, as well as to communicate the fact that they can help buy or lease a Lexus. Toyota would have to show significantly more than "prominent" advertisement to establish the contrary. We therefore conclude that the Tabaris easily satisfy the first *New Kids* factor.

[9] As for the second and third steps of our nominative fair use analysis, Toyota suggests that use of the stylized Lexus

---

[10]Toyota doesn't suggest that the Tabaris used the Lexus mark to refer to those other cars, or that the Tabaris used the Lexus mark in order to redirect customers to those cars. *See, e.g., Nissan Motor Co.* v. *Nissan Computer Corp.*, 378 F.3d 1002, 1019 (9th Cir. 2004). Everyone seems to concede the Tabaris are bona fide Lexus brokers. We therefore do not consider whether the Tabaris used the Lexus mark in conjunction with brokering vehicles other than Lexus, or whether such use would be infringing.

mark and "Lexus L" logo was more use of the mark than nec-
essary and suggested sponsorship or endorsement by Toyota.
This is true: The Tabaris could adequately communicate their
message without using the visual trappings of the Lexus
brand. *New Kids*, 971 F.2d at 308 n.7. Moreover, those visual
cues might lead some consumers to believe they were dealing
with an authorized Toyota affiliate. Imagery, logos and other
visual markers may be particularly significant in cyberspace,
where anyone can convincingly recreate the look and feel of
a luxury brand at minimal expense. It's hard to duplicate a
Lexus showroom, but it's easy enough to ape the Lexus site.

   **[10]** But the Tabaris submitted images of an entirely
changed site at the time of trial: The stylized mark and "L"
logo were gone, and a disclaimer appeared in their place. The
disclaimer stated, prominently and in large font, "We are not
an authorized Lexus dealer or affiliated in any way with
Lexus. We are an Independent Auto Broker." While not
required, such a disclaimer is relevant to the nominative fair
use analysis. *See Welles*, 279 F.3d at 803. Toyota claims the
Tabaris' disclaimer came too late to protect against confusion
caused by their domain names, as such confusion would occur
before consumers saw the site or the disclaimer. *See Brook-
field*, 174 F.3d at 1057. But nothing about the Tabaris'
domains would give rise to such confusion; the Tabaris did
not run their business at lexus.com, and their domain names
did not contain words like "authorized" or "official." *See* pp.
9709-11 *supra*. Reasonable consumers would arrive at the
Tabaris' site agnostic as to what they would find. Once there,
they would immediately see the disclaimer and would
promptly be disabused of any notion that the Tabaris' website
is sponsored by Toyota. Because there was no risk of confu-
sion as to sponsorship or endorsement, the Tabaris' use of the
Lexus mark was fair.

   **[11]** This makeover of the Tabaris' site is relevant because
Toyota seeks only forward-looking relief. In *Volkswagen-
werk*, we declined to order an injunction where the defendant

had likewise stopped all infringing activities by the time of trial, 411 F.2d at 352, although we've said that an injunction may be proper if there's a risk that infringing conduct will recur, *Polo Fashions, Inc.* v. *Dick Bruhn, Inc.*, 793 F.2d 1132, 1135-36 (9th Cir. 1986). Even assuming some form of an injunction is required to prevent relapse in this case, the proper remedy for infringing use of a mark on a site generally falls short of entirely prohibiting use of the site's domain name, as the district court did here. *See Interstellar Starship*, 304 F.3d at 948. "[O]nly upon proving the rigorous elements of cyber-squatting . . . have plaintiffs successfully forced the transfer of an infringing domain name." *Id.* Forced relinquishment of a domain is no less extraordinary.

[12] The district court is in a better position to assess in the first instance the timing and extent of any infringing conduct, as well as the scope of the remedy, if any remedy should prove to be required. We therefore vacate the injunction and remand for reconsideration. The important principle to bear in mind on remand is that a trademark injunction should be tailored to prevent ongoing violations, not punish past conduct. Speakers do not lose the right to engage in permissible speech simply because they may have infringed a trademark in the past.

C. When considering the scope and timing of any infringement on remand, the district court must eschew application of *Sleekcraft* and analyze the case solely under the rubric of nominative fair use. *Cairns*, 292 F.3d at 1151. The district court treated nominative fair use as an affirmative defense to be established by the Tabaris only after Toyota showed a likelihood of confusion under *Sleekcraft*. This was error; nominative fair use "replaces" *Sleekcraft* as the proper test for likely consumer confusion whenever defendant asserts to have referred to the trademarked good itself. *Id.* (emphasis omitted); *see also Welles*, 279 F.3d at 801.

On remand, Toyota must bear the burden of establishing that the Tabaris' use of the Lexus mark was *not* nominative fair use. A finding of nominative fair use is a finding that the plaintiff has failed to show a likelihood of confusion as to sponsorship or endorsement. *See Welles*, 279 F.3d at 801; *New Kids*, 971 F.2d at 308 ("Because [nominative fair use] does not implicate the source-identification function that is the purpose of trademark, it does not constitute unfair competition.").[11] And, as the Supreme Court has unambiguously instructed, the Lanham Act always places the "burden of proving likelihood of confusion . . . on the party charging infringement." *KP Permanent Make-Up, Inc.* v. *Lasting Impression I, Inc.*, 543 U.S. 111, 118 (2004); *see also id.* at 120-21. In this case, that party is Toyota. "[A]ll the [Tabaris] need[ ] to do is to leave the factfinder unpersuaded." *Id.* at 120.

We have previously said the opposite: "[T]he nominative fair use defense shifts to the defendant the burden of proving no likelihood of confusion." *Brother Records, Inc.*, 318 F.3d at 909 n.5. But that rule is plainly inconsistent with *Lasting Impression* and has been "effectively overruled." *Miller* v. *Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc); *see also* 4 *McCarthy on Trademarks and Unfair Competition* § 23:11 at 82 n.5 (4th ed. 2010). A defendant seeking to assert nominative fair use as a defense need only show that it used the mark to refer to the trademarked good, as the Tabaris undoubtedly have here. The burden then reverts to the plaintiff to show a likelihood of confusion.

---

[11]This is necessarily so because, unlike classic fair use, nominative fair use is not specifically provided for by statute. A court may find classic fair use despite "proof of infringement" because the Lanham Act authorizes that result. *See* 15 U.S.C. § 1115(b)(4). Nominative fair use, on the other hand, represents a finding of no liability under that statute's basic prohibition of infringing use. *See id.* § 1114.

## Laches

The Tabaris claim Toyota's case is barred by laches. This would obviate any need to remand, as it would provide a complete defense to Toyota's trademark claims. The district court rejected this defense, and we review for abuse of discretion. *United States v. Marolf*, 173 F.3d 1213, 1218 (9th Cir. 1999).

[13] The district court found that Toyota waited six months before contacting the Tabaris after it became aware of their domain names. The Tabaris point to no evidence that would justify overturning that finding on appeal. Nor was it an abuse of discretion to conclude that short delay was reasonable. An additional delay of two years ensued before Toyota brought this suit, but during that period the parties were actively seeking to resolve this matter out of court. It was not unreasonable for Toyota to attempt to avoid the expense and inconvenience of a lawsuit. *See, e.g., E. & J. Gallo Winery*, 967 F.2d at 1285, 1294.

[14] Nor did the relatively brief delay prejudice the Tabaris. *See id.* at 1294. The Tabaris note that one witness answered "I don't remember" in her deposition, but they present no evidence that the witness's loss of memory occurred during the period of delay. We must therefore affirm the district court's rejection of the Tabaris' laches defense.

## Seventh Amendment

[15] Finally, we consider the Tabaris' claim that the district court deprived them of their right to a trial by jury when it failed to empanel a jury to decide Toyota's trademark claims. Because Toyota only sought an injunction, the district court did not err by resolving its claims in a bench trial. *See, e.g., Anti-Monopoly, Inc. v. Gen. Mills Fun Group*, 611 F.2d 296, 307-08 (9th Cir. 1979). Nor were the Tabaris entitled to a jury trial on their equitable defenses to those claims, *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 962 (9th Cir. 2001), or their

counterclaims seeking declarations of trademark invalidity and non-infringement, *Shubin* v. *U.S. Dist. Ct. for S.D. Cal.*, 313 F.2d 250, 251-52 (9th Cir. 1963).

The Tabaris also claim the district court erred by bifurcating the trademark claims from the Tabaris' counterclaims for intentional and negligent interference with prospective economic advantage, as to which the Tabaris undoubtedly did have a right to trial by jury. After resolving the trademark claims in a bench trial, the district court granted summary judgment against the Tabaris on the interference counterclaims. This was proper only if there were no common factual issues among the bifurcated claims; otherwise, the interference counterclaims should have been addressed first in order to avoid the risk that findings made in the bench trial would become the law of the case and prevent a jury from determining the common issues. *See Dollar Sys., Inc.* v. *Avcar Leasing Sys., Inc.*, 890 F.2d 165, 170 (9th Cir. 1989).

[16] There's no need for an exhaustive inquiry to determine whether there was factual overlap between the claims; we can take Toyota's word for it. After the bench trial, Toyota sought summary judgment on the Tabaris' counterclaims on the ground that:

> Much of the testimony and evidence offered at trial to support or refute Defendants' affirmative defenses and . . . counterclaims . . . involve the same issues of proof necessary to Defendants' pending tortious interference counterclaims. For example, the factual allegations underlying Defendants' affirmative defense of inequitable conduct, unclean hands and trademark misuse are also central to Defendants' tortious interference counterclaims.

Toyota claimed there was no longer any need for a jury trial because the district court's bench trial findings constituted the

"law of the case."[12] Of course, this is precisely the result—forfeiture of the right to trial by jury—that the rule articulated in *Dollar Systems* strives to prevent. *Id.* Because Toyota never should have been in a position to make such an argument, the procedure adopted by the district court was error.

[17] Nevertheless, it was harmless, and there's no need to revisit the issue on remand. *See Kulas* v. *Flores*, 255 F.3d 780, 784 (9th Cir. 2001). When the district court granted summary judgment on the Tabaris' counterclaims, it didn't rely on any factual findings made at the bench trial. It determined that any reasonable jury would have to hold for Toyota on the counterclaims: With regard to the Tabaris' claim of negligent interference, it held that the Tabaris had failed to provide any evidence that Toyota owed them a duty of care. *See Stolz* v. *Wong Commc'ns Ltd. P'ship*, 31 Cal. Rptr. 2d 229, 238 (Cal. Ct. App. 1994). And, with regard to the intentional interference claim, it found that Toyota's act of bringing suit was absolutely privileged, *Silberg* v. *Anderson*, 786 P.2d 365, 370-72 (Cal. 1990), and that the Tabaris had failed to provide any other evidence of intentional interference. The Tabaris don't challenge the substance of those holdings on appeal.[13]

---

[12]Toyota artfully maneuvered to obscure this factual overlap before trial and again on appeal. Toyota argued in favor of bifurcation on the grounds that even "a cursory review" would show "that there are no common issues of fact between any of these original claims and the counterclaims." This was technically correct: The overlap was between the Tabaris' defenses and counterclaims, not Toyota's "original claims" and the Tabaris' counterclaims. Toyota evidently hoped that the district court would not notice the careful parsing of its language, and that the Tabaris (who are defending this case pro se) would not call it to the court's attention.

Toyota is playing the same game on appeal: It states that bifurcation was proper because "[t]here was no factual overlap between Toyota's trademark claims and Fast Imports' interference claims." But Toyota is only telling half the story by talking about only half of the relevant claims; Toyota admitted as much in its motion for summary judgment. Such selective memory exceeds the bounds of zealous advocacy.

[13]The Tabaris do challenge the district court's holding that they failed to present evidence that they were damaged by Toyota's alleged tortious

Because the district court could have granted summary judgment on this basis before the bench trial, it was harmless error for it to do so after the trial was concluded. *See Kulas*, 255 F.3d at 784. On remand, the district court therefore need not disturb its grant of summary judgment on the Tabaris' interference counterclaims.

\* \* \*

We vacate and remand for proceedings consistent with this opinion. At the very least, the injunction must be modified to allow some use of the Lexus mark in domain names by the Tabaris. Trademarks are part of our common language, and we all have some right to use them to communicate in truthful, non-misleading ways.

Many of the district court's errors seem to be the result of unevenly-matched lawyering, as Toyota appears to have taken advantage of the fact that the Tabaris appeared pro se. *See, e.g.*, p. 9720 n.12 *supra*. To avoid similar problems on remand, the district court might consider contacting members of the bar to determine if any would be willing to represent the Tabaris at a reduced rate or on a volunteer basis.

**VACATED AND REMANDED.**

Costs on appeal are awarded to the Tabaris.

FERNANDEZ, Circuit Judge, concurring:

I concur in the majority's conclusion that the district court erred in its handling of the nominative fair use defense. I write

conduct. But the district court also found that no reasonable jury could find Toyota liable. The Tabaris' argument that they were damaged is irrelevant in light of this unchallenged holding regarding liability.

separately, however, because I cannot concur in all that is said by the majority.

First, and principally, I feel compelled to disassociate myself from statements by the majority which are not supported by the evidence or by the district court's findings. I simply cannot concur in essentially factual statements whose provenance is our musings rather than the record and determinations by trier of fact. For example, on this record I do not see the basis for the majority's assertion that the "relevant consumer is . . . accustomed to shopping online";[1] or that "[c]onsumers who use the internet for shopping are generally quite sophisticated"[2] so that they are not likely to be misled; or that "the worst that can happen is that some consumers may arrive at [a] site uncertain as to what they will find";[3] or that, in fact, consumers are agnostic and, again, not likely to be misled;[4] or that "[r]easonable consumers would arrive at the Tabaris' site agnostic as to what they would find."[5]

Second, I am unable to join the gratuitous slap at counsel for Toyota in the majority opinion,[6] which I see as entirely unnecessary to our decision or even to the upholding of the marmoreal surface of the law.

Finally, I do not join the final textual paragraph, which nudges the district court to find pro bono counsel for the Tabaris, who have neither chosen to retain their own counsel nor demonstrated that they cannot do so. To the extent that the majority sees their activities as especially socially worthy and above reproach, I do not agree.

Thus, I respectfully concur in the result.

---

[1]Majority opinion, page 9706.

[2]*Id.* at 9709.

[3]*Id.* at 9711.

[4]*Id.* at 9711.

[5]*Id.* at 9715.

[6]*Id.* at 9720 n.12.