```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF NEW JERSEY
 2              CIVIL ACTION  2:10-CV-3571-SDW


 3
       HAYWARD INDUSTRIES, INC.,    : TRANSCRIPT OF PROCEEDINGS
 4                                  :
                                    :        M O T I O N
 5                   Plaintiff,     :
                                    :       Pages  1 - 20
 6              -vs-                :
                                    :
 7      AQUASTAR POOL PRODUCTS,     :
        INC.,                       :
 8                   Defendant.     :
       - - - - - - - - - - - - - - -
 9
                                        Newark, New Jersey
10                                      July 22, 2010

11     B E F O R E:   HONORABLE SUSAN D. WIGENTION,
                      UNITED STATES DISTRICT JUDGE
12

13     A P P E A R A N C E S:

14          McCARTER & ENGLISH, LLP
            BY:  SCOTT S. CHRISTIE, ESQ.
15          MARK ANANIA, ESQ.
            THOMAS GOODWIN, ESQ.
16          Attorneys for the Plaintiff

17          LOWENSTEIN SANDLER KOHL FISHER & BOYLAN
            BY:  DAVID LEIT, ESQ.
18          KHIZAR SHEIKH, ESQ.
            Attorneys for the Defendant

19

20     _____
            Pursuant to Section 753 Title 28 United States Code, the
21     following transcript is certified to be an accurate record as
       taken stenographically in the above entitled proceedings.

22

23                      S/Carmen Liloia
                        CARMEN LILOIA
24                      Certified Court Reporter
                        (973-477-9704)
25
```

```
 1              THE COURT:  All right.  This is matter of Hayward
 2    Industries, Inc. versus AquaStar Pool Products, Inc.  Its civil
 3    action number is 10-3571.
 4              And, counsel, you may enter your appearances, please.
 5              MR. CHRISTIE:  Good morning, your Honor.  Scott
 6    Christie, McCarter & English, on behalf of plaintiff, Hayward
 7    Industries.  Seated with me at counsel table is Mark Anania and
 8    Tom Goodwin.
 9              THE COURT:  Good morning to all of you as well.
10              MR. LEIT:  Good morning, your Honor.  David Leit from
11    Lowenstein Sandler for AquaStar Pool Products.  With me a
12    Khizar Sheikh from my office.
13              THE COURT:  And good morning to both of you as well.
14    We have ten more minutes of morning, so.
15              All right.  So we're here for a couple of things.  The
16    Court entered a temporary restraining order, along with an
17    order to show cause, on July 15th, setting down today's date.
18    In the interim, I have received pleadings and submissions from
19    the defendants as recently as yesterday which enclosed a copy
20    of a case from the Ninth Circuit.  And in addition -- I should
21    say, in conjunction with the filings provided by the
22    defendants, the Court received an additional order to show
23    cause, but essentially it's to dissolve the Court's order,
24    which was entered July 15th.  Is that fair to say?
25              MR. LEIT:  That's all fair to say, your Honor.
```

```
 1              THE COURT:  Okay.  So -- and I know that there was
 2    some concerns about getting in to have the matter heard.  I
 3    assume we could sort of take care of all of it today because
 4    essentially that's why we're here.  I know that the plaintiffs
 5    have not provided a response to that, at least I have not
 6    received one if you have, and so to the extent we need to
 7    address that, we can do so.  But why don't we start with the
 8    plaintiffs who actually are here at this point.  I mean, I
 9    understand an order has been issued, but we'll go from there.
10              MR. CHRISTIE:  Yes, Judge.
11              An order has been issued and we are here seeking a
12    preliminary injunction to follow up on the TRO.  I think,
13    Judge, that the papers speak volumes about how clear and
14    overwhelming the case is with regard to likelihood of success,
15    irreparable harm, balance of the equities, and promoting public
16    interest.  In essence, Judge, it doesn't get much worse than
17    this in the commercial context with regard to cyber squad.  A
18    direct competitor of Hayward registered a domain name,
19    "haywardreplacementparts.com", which they have used to do
20    nothing other than to promote and sell their competing
21    replacement parts for Hayward's automatic pool cleaners.
22    They're not using it to set up a separate website, they're
23    using it to direct Internet traffic to their website where they
24    promote and sell the products.
25              Under the established law and in the range of cyber
```

```
 1    squading offenses, this is one of the worst.  A direct
 2    competitor who was capitalizing upon the good will in the
 3    market to do nothing other than to compete unfairly.  We have
 4    an established registered trademark of Hayward which has been
 5    registered since 1977, used in commerce for over 50 years.  It
 6    has certainly been demonstrated, I think, without doubt, that
 7    the infringing domain name wholly incorporates this trademark.
 8          THE COURT:  Did you get a chance, Mr. Christie, to
 9    read the case that was provided by the Ninth Circuit?
10          MR. CHRISTIE:  I did.
11          THE COURT:  What did you think about that?  Obviously
12    it's not binding upon the Court.
13          MR. CHRISTIE:  Right.
14          THE COURT:  It's merely persuasive, if anything.  But
15    I'm curious as to your thoughts.
16          MR. CHRISTIE:  I did read that.  And I think that,
17    number one, it is not binding on the Court.  But there are two
18    critical distinctions, Judge.  Number one, in that case you did
19    not have direct competitors.  Here, it is clear that the
20    companies directly compete for the same products, for the same
21    consumers, in the same channels of trade; and therefore, by
22    virtue of that alone, that case is distinguishable.
23          And the other distinguishing factor, Judge, is that in
24    the Toyota case, there was a finding of fair use that the
25    domain name was used fairly and in compliance with the
```

1    trademark laws.  Here, that is not even remotely close to being
2    the case.  Here, we have a commercial use by a competitor to
3    siphon off benefits and usurp good will and it doesn't even
4    come to close to meeting any fair use standard.  So
5    respectfully, Judge, we would argue that case is in apposite
6    and does not apply here.
7         THE COURT:  So in addition, AquaStar says now:  We
8    don't use that.  We don't use that domain name at all.  If you
9    go to it, you can purchase it.  It's a park domain name.  So,
10   what's your thought about that?
11        MR. CHRISTIE:  That's true, Judge.  As far as we can
12   tell, they have ceased use.
13        THE COURT:  Do you know when the usage ceased?
14        MR. CHRISTIE:  I do not.  But I imagine it was close
15   in time to the fact -- to the time when you entered the TRO.
16        But however, Judge, the harm still remains.  They have
17   mentioned they're willing to transfer the domain name to
18   Hayward.  They have not made any efforts to do so yet.  But
19   coupled with the fact they've shown a proclivity to engage in
20   this kind of conduct, makes it important that they be enjoined
21   from doing similar things with similar domain names in the
22   future.  They could turn around tomorrow and register another
23   domain name incorporating Hayward into it and we would have to
24   police that as well.
25        As you know from the complaint, there is a history

1    between these two companies showing a disrespect of Hayward's

2    intellectual property by AquaStar, so we're not operating in a

3    vacuum.  And unfortunately AquaStar has engaged in a pattern of

4    practice of infringing Hayward's trademarks for its own

5    commercial benefit.

6          So for those reasons, Judge, we believe that a

7    preliminary injunction should enter.

8          THE COURT:  Okay.

9          Now, one of the other issues that AquaStar had was

10   that they felt the order went above and beyond what was

11   necessary and what was actually provided to the Court in

12   written submissions.  You want to speak to that at all?

13         MR. CHRISTIE:  Yes, Judge, I'd like to.  Thank you.

14         They did make mention of the fact that they thought

15   that some of the relief was a bit broad.  And it is clear that

16   there are certain ambiguous terms which could be read broadly,

17   which was not our intent.  Subsequent to that, we have engaged

18   in discussions with AquaStar toward clarifying those

19   ambiguities.  And, in fact, we had anticipated entering into a

20   stipulation which the Court could so order to resolve those

21   ambiguities, but for a call I received yesterday from Mr. Leit

22   saying that that was not adequate and we'd have to have a

23   hearing.  So we've been willing and able to try and resolve

24   that informally, Judge, and unfortunately AquaStar is not

25   amenable to doing that.

```
 1                THE COURT:  All right.

 2                Mr. Leit.

 3                MR. LEIT:  Thank you, your Honor.

 4                This is not an overwhelming case of showing cyber

 5      squadding or unfair competition.  The fact of the matter is that

 6      AquaStar is engaged in business of selling legitimate

 7      replacement parts for Hayward products.  There's no allegation

 8      that there's anything wrong with that.  The principles of

 9      nominative fair use, which are oddly not only the Ninth Circuit

10      case that I provided to you, your Honor, yesterday, but also

11      the Third Circuit and the District of New Jersey cases that

12      were originally cited in the brief, all speak to this issue of

13      nominative fair use.  I think the -- Judge Walls's decision,

14      which notably was a summary judgment decision, so it was a

15      decision as a matter of law in the Defco case, it's

16      particularly instructive, that case, also involved two

17      competitors, one of whom was selling replacement parts for the

18      other's products.  The situation was virtually identical.  The

19      issue was using the other -- using the plaintiff's trademarks

20      in a nominative way to say:  We sell replacement parts for

21      their products.

22                THE COURT:  Was in the domain name.

23                MR. LEIT:  It was not in the domain name in that

24      particular case.

25                THE COURT:  I mean, because doesn't AquaStar, you have
```

Motion

1     a website now where you can go on that website and you can

2     access purchasing Hayward products, or replacement parts by

3     Hayward products, right?

4           MR. LEIT:  There's a website that is currently active

5     call prostarreplacementparts.com that does advertise and sell

6     replacement parts for Haywood products, yes.

7           THE COURT:  Right.  And that's owned by AquaStar?

8           MR. LEIT:  That is owned by AquaStar, correct.

9           THE COURT:  Okay.

10          MR. LEIT:  As to the issue of the domain name in

11    particular, I don't think the nominative fair use analysis is

12    any different than -- well, that specific issue has not been

13    addressed in the Third Circuit or the District of New Jersey.

14    It was squarely addressed in the ninth Circuit Case and the

15    Third Circuit and District of New Jersey cases previously on

16    nominative fair use have cited the Ninth Circuit as instructive

17    because the Ninth Circuit dealt with this issue more than any

18    other circuit.  The nominative fair use analysis should be no

19    different for a domain name than for any other use of the mark.

20    And the domain that was at issue here was Hayward Replacement

21    Parts.

22          THE COURT:  The question becomes, is it sponsored by

23    Hayward products, or endorsed by Hayward products?  And I think

24    that becomes the concern when you talk about nominative fair

25    use.

Motion

```
 1              MR. LEIT:  Again, I think the Ninth Circuit case is
 2    very instructive on this.  It goes into some detail about how
 3    people actually use and access the Internet.  They don't tend
 4    to type in:  Hey, I'm looking at Hayward replacement parts, so
 5    they type in haywardreplacementparts.com and do a Google search
 6    or they do a Yahoo search.  And the Court in the Ninth Circuit
 7    case clearly distinguished that there's a difference if we had
 8    registered Hayward.com, just the trademark, versus something
 9    that describes what we do, which is that we sell Hayward
10    replacement parts.
11              In any event, the injunction that is being sought here
12    and the TRO that was entered goes much further than that.  It
13    would also preclude AquaStar from registering, for example, a
14    domain name that says, "wearenothayward.com."  Because the
15    injunction as currently written says:  Any use of the name is
16    improper.  I mean, it would also presumably exclude us from
17    saying:  We sell Haywood replacement parts, but we are not
18    hayward.com.  So it's clearly over-broad as written.  But more
19    to the point, at this point it's moot, because we have
20    abandoned the name.
21              THE COURT:  So when did you cease using the domain
22    name?
23              MR. LEIT:  I can't give you exact dates and time.  I
24    was retained on this matter on Thursday of last week about the
25    same time the TRO was coming out.  I know that -- I should say,
```

1    my understanding is that AquaStar, putting wheels in motion to

2    take down the website and abandon it, at about the same time as

3    they were -- as they were reviewing the papers.  I don't know

4    whether it was taken down --

5            THE COURT:  So July 15th or thereabouts?

6            MR. LEIT:  July 15th or 16th.  What I don't want to be

7    is too detailed about that.  I just don't know whether it came

8    after the TRO was issued or before.

9            THE COURT:  I appreciate that.  It's just that the

10    paperwork, it seemed like -- that was just information that

11    wasn't in there.  You kept saying:  It's moot.  It's moot.  But

12    I'm like:  Well, when did it become moot?  Did it become moot

13    after the order was issued?  Was it before --

14            MR. LEIT:  I don't know the precise answer to that,

15    your Honor.  But the fact of the matter is, it's moot now.

16    There's no reason for you to maintain the injunction in any

17    form for that reason at this time.

18            THE COURT:  So let me ask you this.  So why can't we

19    have an agreement that during the pendency of this litigation

20    there, you know, there will be no -- you know what I'm saying,

21    why can't there be some type of agreement?

22            MR. LEIT:  Well, I mean, if we entered into that

23    agreement between us, yes, that's possible.  I don't think that

24    it's proper to have an injunction on that because, as the

25    Supreme Court has said, equity can only enjoin actions that are

Motion 11

```
 1      actually taken or threatened to be taken.  At this point none
 2      of the actions that are enjoined -- well, let me back up.
 3      There are a couple of different things that are enjoined, some
 4      of which we are clearly doing.  We're using the Hayward name on
 5      our website.  We're using other of their trademark --
 6              THE COURT:  And I don't think they have an issue with
 7      that.  I mean, they may not like it.
 8              MR. CHRISTIE:  Correct, Judge, as long as they do it
 9      right way.
10              THE COURT:  Yes, they may not like it, but that's not
11      basis of this action.
12              MR. LEIT:  It is the basis of the action because one
13      of the things sought for relief in the complaint, and it's one
14      of the things that is the subject of the TRO that's currently
15      in place.  So I take it then that your Honor is inclined to
16      dissolve at least that part of the TRO.
17              As to the parts enjoining our use of particular domain
18      names during the pendency of the case, there is no basis --
19      there's no factual basis to enjoin actions that are not being
20      taken and that are not threatened to be taken.  Frankly --
21              THE COURT:  But when did the domain -- when did that
22      usage begin, do you remember?  Do you know, I should say?
23              MR. LEIT:  I don't know.  I believe it's in the
24      papers.  It's probably --
25              MR. CHRISTIE:  I believe, Judge, that the domain name
```

```
 1    was registered in late May.  Not clear exactly when they began

 2    using it, but that's at least when they registered the domain

 3    name.

 4              THE COURT:  Okay.

 5              Okay, go ahead, Mr. Leit.

 6              MR. LEIT:  In any event, your Honor, I don't think

 7    it's the basis for having an injunction for action that's not

 8    being taken.  Frankly, I think there's even a jurisdictional

 9    issue in that there's no case or controversy if we don't have

10    any of these domain names and we haven't threatened to take any

11    of the names that they apparently have a problem with.

12              There's also a First Amendment issue in that enjoining

13    our use of particular words or domain name or on a website is a

14    prior restraint on free speech and is inappropriate, frankly,

15    under the First Amendment.

16              THE COURT:  Okay.  So, let me ask you this, Mr. Leit,

17    so there's no willingness on the part of AquaStar to enter into

18    an agreement.  Let's assume the Court is not entering a further

19    injunction.  Because, I mean, obviously there's an action

20    that's pending.  I've already issued a -- the TRO.  So tell me

21    about where they stand in that regard.  I mean, I know you

22    talked, but obviously nothing was resolved.

23              MR. LEIT:  At this point my client's first priority is

24    to dissolve the TRO in its entirety and to oppose the

25    preliminary injunction.  Once that is accomplished and there's
```

Motion                                                                    13

 1         no further court orders against my client, I think at that
 2         point, yes, we're willing to talk about resolving the case.
 3                  THE COURT:  Okay.  All right.
 4                  Mr. Christie, you want to be heard further?
 5                  MR. CHRISTIE:  Yes, Judge.
 6                  I think a lot of what Mr. Leit is mentioning are
 7         things that we can and are currently willing to deal with.
 8                  When he talks about nominative fair use, that is one
 9         of the ambiguities I mentioned earlier in my presentation.
10         They are certainly entitled to use Hayward's trademarks as long
11         as -- well, and one way it's is if it's comparative in a
12         nominative fair use sense.  To the extent that the order maybe
13         interpreted to prevent that, we're happy to clarify that so
14         that it's not an issue.
15                  The problem we're having, Judge, is that Mr. Leit
16         says:  Well, there's nothing really to enjoin because once we
17         got our face slapped and got our hand caught in the cookie jar,
18         we immediately ceased doing the bad stuff, so now you have no
19         basis for enjoying us.  But I think what's clear, Judge, is
20         that unfortunately AquaStar plays fast and use with the law.
21         And by not having an injunction in place, and given the history
22         between the parties, we are setting ourselves up for another
23         adversarial action which can easily be avoided by virtue of
24         injunctive relief which is warranted, given the history.
25                  You know, to the point, Judge, one thing we are

 1    seeking, which we haven't received, is a sworn statement by
 2    AquaStar as to Internet domain names that they have in the past
 3    registered and currently have registered, which may incorporate
 4    Hayward's trademarks.  They have not given that to us.  And
 5    given the history between the parties, we are concerned that
 6    maybe more domain names out there that we're not aware of that
 7    someone has registered on behalf of AquaStar, which incorporate
 8    the Hayward trademark or perhaps other trademarks, and their
 9    unwillingness to give us a sworn statement to that effect
10    reinforces that concern.
11             So, Judge, what we've done, and what we've taken the
12    liberty of doing is drafting a proposed order granting a
13    preliminary injunction, which in many respects incorporates the
14    stipulation that the parties had discussed prior to being here
15    today, which Hayward was willing to enter into and have you so
16    order.  And if you don't mind, I'd just like to hand it up to
17    you.
18             THE COURT:  That would be great.
19             MR. CHRISTIE:  Which clarifies the ambiguities about
20    which Mr. Leit complains, and is more fair and balanced now
21    that we've had a moment to reflect, and didn't have to rush
22    into court to get the relief that we're seeking.
23             THE COURT:  Mr. Leit.
24             MR. LEIT:  Yes, your Honor.
25             The issue isn't simply that we're no longer using that

Motion                                                                    15

 1    domain name in particular and have no intent to use any other
 2    domain names at this time that use the Hayward name.  I do
 3    think that's enough to deny the injunction.
 4          The other point though is, under the precedents of
 5    Judge Wall's decision in the Defco case and under Third Circuit
 6    precedent, and certainly under the reasoning of the Ninth
 7    Circuit case in the Lexus case, the fact of the matter is, it's
 8    not illegal for us to use Hayward trademarks in our domain
 9    name.  That is also nominative fair use.  Even if your Honor
10    doesn't want to decide today that it is nominative fair use, I
11    think it's pretty much incontrovertible that we have a credible
12    affirmative defense of nominal fair use.  That alone defeats
13    Mrs. Christie's argument that there's a clear showing of
14    likelihood of success on the merits.  And I'm only looking at
15    this proposed order right now.  It is similar to something that
16    I saw before so it's not completely out of blue for me.  But as
17    I'm looking at the findings, we fundamentally disagree with one
18    of his findings, that Hayward has demonstrated a likelihood of
19    success on its merits.  We don't believe that's the case.  We
20    believe we're likely to succeed on the merits on all points
21    under a nominative fair use defense.  I don't think that
22    Hayward has demonstrated that they'll be irreparably injured.
23    In fact, this order is injuring my client's business by
24    impacting our ability to promote our products as we see fit,
25    which also goes to point number 4.

```
 1              And then in terms of the actual items that are ordered
 2      here, for example, again, it goes to barcode, meta tags.  These
 3      are issues that many courts, including courts in this district,
 4      have found to be perfectly proper under a nominative fair use
 5      defense.  So the problem is that order still goes way too far,
 6      and there's no basis for any type of preliminary injunction or
 7      temporary restraining order remaining in effect during the
 8      pendency of this case.
 9              MR. CHRISTIE:  Your Honor, may I be heard?
10              THE COURT:  Sure.
11              MR. CHRISTIE:  With regard to the nominative fair use
12      argument that Mr. Leit makes.  He is obviously arguing in the
13      abstract.  We're talking about realities where we have a direct
14      competitor of Hayward misusing trademarks and in fact Hayward's
15      main trademark in domain names.  He claims nominative fair use
16      but in fact, Judge, it's nothing of the kind.  In essence, what
17      it's doing, it's the concept of initial interest confusion.
18      You're setting up a domain name out there, it has Hayward in
19      it, it has the word "replacement parts," and you're confusing
20      consumers who are looking for replacement parts for their
21      Haywood pool cleaner to access the website, and lo and behold
22      it has nothing to do with Hayward, but Hayward's main
23      competitor in the replacement part market.  So in essence they
24      are confusing consumers into entering the website and offering
25      the lower costs and sub-standard quality replacement parts for
```

```
 1    their cleaners, which in fact void the warrantees.

 2           So while there is a nominative fair use element to

 3    this case, and they are permitted to use Hayward trademark and

 4    other trademarks of Hayward on their websites and in their

 5    promotional materials, as long as they do it in a manner that

 6    doesn't suggest they are affiliated with or endorsed by

 7    Hayward, that's fine.  And that's what we hoped to achieve and

 8    I think we did achieve in this proposed order that I handed up

 9    to your Honor minutes ago.

10           But as far as dealing with the nominative fair use

11    argument in the domain name context, frankly, Judge, it's a red

12    herring.  And it's an intent by the defendant to avoid what is

13    appropriate and proper here, which is the entry of a

14    preliminary injunction.

15           MR. LEIT:  Your Honor --

16           THE COURT:  Go ahead, Mr. Leit.

17           MR. LEIT:  Just on the issue of initial interest

18    confusion.  That's a line of reasoning that has been

19    increasingly rejected by the courts.  And that's because of

20    essentially the same reasoning that's in that Lexus case from

21    the Ninth Circuit.  People who are looking for Haywood

22    replacement parts, whether they are looking for replacement

23    parts from Hayward, or they're looking for replacement parts

24    for Hayward products from somebody else, are unlikely to simply

25    do that by typing into the URL box,
```

```
 1    www.haywardreplacementparts.com.  They go to a search engine.
 2    And that's the reality that the courts are increasingly
 3    recognizing such that this idea of initial interest confusion
 4    just doesn't hold any water.
 5         If your Honor looks at the exhibits attached to the
 6    verified client, it shows shots of the website and the catalogs
 7    that's on there that makes it very clear that this is Prostar
 8    is the brand that's being promoted.  And that it says very
 9    clearly that we are selling replacement parts for Hayward
10    products, Aquavac -- and I forget the other trademark.  It's
11    all clear nominative fair use.  I think the use of the domain
12    is also a nominative fair use.  It simply says:  Hayward
13    replacement parts.  That's exactly what we sell, the same way
14    that in the Lexus case they, you know, said that they are a
15    Lexus broker.  And that's exactly what they do.
16         THE COURT:  Okay.  Very well.
17         All right, counsel.  What I'm going to do is, I'm
18    going to take it under advisement.  I'm going to leave the
19    order that I've issued in effect, just because I want to look
20    at a couple of issues a little closer.  But I did recognize
21    that AquaStar took issues with paragraph 5 of the July 15th
22    order indicating that Hayward would pay the cost of the action,
23    filing fees and reasonable attorney's fees.  And, you know, I
24    have no problem dissolving that portion of it because, quite
25    honestly, I don't think that's appropriate.  But I want to look
```

```
1     at the order that was submitted to the Court and was proposed.
2            I do think the concern the Court has, in looking at
3     the Rule 65 factors, specifically whether an irreparable injury
4     to the moving party, Hayward in particular in this case, would
5     result and, quite honestly, if what's occurring is that
6     consumers are being misled, then obviously there is irreparable
7     injury to them.
8            To the extent the order needs to reach certain areas,
9     that's, that's where I'm having the issue.  So that's the part
10    a that I really want to address in further detail.  But I do
11    not -- I don't see the harm to AquaStar, quite honestly,
12    counsel.  I mean, they do have other websites and they do
13    exactly what this purported website was suppose to do.  So
14    they're not precluded from continuing and maintaining their
15    business.
16           What I did not see in any of the written submissions
17    is the timelines in which AquaStar's other domains have been up
18    and domain names have been up and running and they've been
19    engaging in the sale of these replacement parts.  So nothing
20    has been indicated or provided to the Court to show that
21    there's some irreparable harm or any harm to AquaStar.
22           In addition, the bigger issue becomes the likelihood
23    of success on the merits.  That is the aspect within which I'd
24    like to look a little closer, so I will do that.  And also, as
25    I said, the public interest is clearly there in terms of
```

```
 1    granting the relief in the event that consumers are being
 2    misled.
 3             So I will take it under advisement.  The order as
 4    previously entered will stand for this period of time that I do
 5    that, and I assure counsel that I will issue an order within
 6    the next several days.  Okay?
 7             MR. LEIT:  Your Honor, just to clarify.  The order is
 8    going to stand except for the attorney's fees order?
 9             THE COURT:  Exactly.  So I'm withdrawing or
10    dissolving, I should say, that portion.  And we will be guided
11    accordingly and issue an order as appropriate.  Okay?
12             Now, in the interim, should you talk and work
13    something out, I'm more than welcome to receive that as well.
14    Okay?  Thank you, counsel.
15             MR. LEIT:  Thank you, Judge.
16             MR. CHRISTIE:  Thank you, very much.
17             (Matter concluded)
18
19
20
21
22
23
24
25
```